Filed 4/15/13 On transfer from the Supreme Court

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D060317 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. BAF004719) |
| VINCE BRYAN SMITH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Patrick F. Magers, Judge.  Affirmed as modified.

Cannon & Harris and Gregory L. Cannon for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Scott C. Taylor and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]      Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of DISCUSSION parts B through H.

A jury convicted defendant and appellant Vince Bryan Smith of two counts of second degree murder (Pen. Code,[1] § 187, subd. (a), counts 1 & 2) and one count of active participation in a criminal street gang (§ 186.22, subd. (a), count 3). On both counts 1 and 2, the jury found true an allegation that the murders were committed for the benefit of, at the direction of or in association with a criminal street gang (§ 186.22, subd. (b)(1)).

The jury also found that Smith did not commit multiple murders as alleged in the special circumstance (§ 190.2, subd. (a)(3)) and did not intentionally kill the victims while an active member of a criminal street gang and in furtherance of that gang (§ 190.2, subd. (a)(22)).

The trial court sentenced Smith to 15 years to life on count 1 and imposed sentence on count 2 concurrent to count 1. On both gang allegation findings, the court imposed the 15-year mandatory parole eligibility term under section 186.22, subdivision (b)(5) and an additional 10-year term on each count under 186.22, subdivision (b)(1)(C), but stayed the 10-year terms. On count 3, the court imposed the middle term of two years and imposed the sentence concurrent to the terms on counts 1 and 2.

Smith raised myriad issues on appeal, including that the trial court erred when it imposed the two-year term on count 3. In our opinion filed June 8, 2012, we modified the abstract of judgment to show court security fees in the total amount of $60, or $20 per

---

[1]     Unless otherwise noted, all statutory references are to the Penal Code.

conviction, as provided in former section 1465.8, subdivision (a)(1) and to delete the 10-year gang enhancement imposed under section 186.22, subdivision (b)(1)(C). Otherwise, we affirmed the judgment of conviction.

Smith filed a petition for review with the California Supreme Court. On September 12, 2012, the court granted the petition and transferred the case back to us with directions to reconsider our opinion in light of *People v. Mesa* (2012) 54 Cal.4th 191, 199-200, which held that section 654 did not permit separate punishment for the section 186.22, subdivision (a) crime of active participation in a criminal street gang when the only evidence of such participation was the current charged offenses.

In light of *People v. Mesa*, we conclude in this reissued opinion that in addition to the relief previously granted, Smith's sentence on count 3 must be stayed pursuant to section 654, subdivision (a).

FACTUAL AND PROCEDURAL OVERVIEW[2]

A. *Background of Gangs Involved in the Killings*

At all times relevant in this case, Smith was a member of the Gateway Posse Crips criminal street gang (GPC). Vincent McCarthy (Vincent), one of the two murder victims in this case and a friend of Smith, was a member of and a leader in GPC. The other

_____

[2]    We view the evidence in the light most favorable to the judgment of conviction. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.) Certain portions of the factual and procedural history related to issues raised by Smith are discussed *post*, in connection with those specific issues.

murder victim was Demetrius Hunt (Demetrius), Smith's cousin and an "associate" of GPC. As a Crips gang, GPC is the prominent enemy of Blood gangs. At the time of the killings, GPC had about 100 members in the Palm Springs area.

Pueblo Bishop Bloods (PBB) was another street gang involved in the killings. PBB originally formed in Los Angeles; as the gang grew, its territory expanded beyond Los Angeles. At the time of the killings, PBB had about 200 to 300 members. PBB members were known to carry guns and use them against rival gangs, where fights often turned violent and deadly. Before the killings, there was a history of violence between PBB and GPC.

Robert McMorris (Robert) was a member of YAH Squad (YAH)[3] which is based in Banning, California. YAH began as a dance crew or clique in 2002 and eventually transitioned into a criminal street gang. At the time of the killings, YAH had about 10 members and had developed an affiliation with PBB because one of the members of YAH, Deshawn Littleton (Deshawn), was also affiliated with PBB. In fact, the Littleton family was one of our four main families involved in PBB.

Certain members of YAH were known to carry guns. A few months before the killings, YAH member Jermarr Sessions (Jermarr) showed his gun to a neighbor and said he carried it for protection. Edward Scott (Edward), also a YAH member, twice flashed a gun at another neighbor. Dominic Betts (Dominic), who attended Banning High School

---

[3] "YAH" stands for "Young Ass Hustlers."

with several YAH members, testified seeing YAH members carrying guns about 10 times.

Specifically, Dominic saw Deshawn carrying a .38-caliber Glock pistol and saw this gun at Deshawn's house about five times. Dominic testified that it was normal for YAH members to carry guns for protection from other gangs and that he had been involved in fights with YAH members when the fights turned particularly violent, including in one instance when Dominic, who described himself as an "associate" of YAH but not a member, beat another gang member (likely a Blood) over the head with a baseball bat after identifying himself as a YAH member and while other YAH members watched.

At the time of the killings, many of the YAH members lived at or frequently visited the apartment complex on Williams Street (Williams Street Apartments) in Banning. That complex was nicknamed "The Pueblos." About one block from the Williams Street Apartments was another apartment complex called the "Peppertree Apartments."

B. *Events Leading Up to the Killings in February 2006*

Before the killings, YAH members were upset with Robert because he was not adequately representing or participating in the gang. Gang members participate by earning money for and/or defending the gang and its "turf" (e.g., gang territory). When a

5

gang member is not participating, the member may receive a "discipline" or "DP," which is essentially a beating by other members of the member's own gang.

YAH members planned to discipline Robert. YAH member Aaron Lee (Aaron) threatened Robert a few weeks before the killings. As a result, Robert decided he wanted out of YAH. Smith also wanted his brother out of YAH.

A few days before the killings, then 12-year-old Demontre C. walked to a liquor store with members of YAH.[4] As they were outside the liquor store, Smith drove up, got out of his car and approached YAH member Edward and said, "I need to talk to you." Smith, who appeared "really mad," asked Edward, "When you all supposed to be putting hands on my little brother?" When Smith clarified that Robert was his younger brother, Edward told Smith that nobody was supposed to put hands on Robert because he was "the little homie."

YAH member Lonnie Walton (Lonnie) testified he also was present at the liquor store and witnessed this exchange, that he heard "bits and pieces" of the conversation, that Smith told the group he would "kill one of you little niggers over my brother" and that he wanted his brother out of YAH.

Demontre testified that although Edward told Smith that Robert was supposed to get a "DP" for not representing YAH, Edward agreed there was not a problem with

---

[4] Demontre testified at Smith's preliminary hearing. As discussed *post*, Demontre was killed in October 2007. His testimony from the preliminary hearing was read into the record in Smith's trial.

Robert. As Smith was leaving, Lonnie testified it appeared Smith threw up the hand sign for GPC.

Deshawn also was present at the liquor store during the exchange between Smith and Edward. Deshawn and Edward were angry at Smith because he had "come at [Edward] foul," which Demontre testified meant Smith had disrespected YAH. As the group walked back to the apartments, Deshawn more than once said—while pounding his fists—that he was "going to beat the fuck out of that nigger [Robert]." Deshawn mentioned he was going to call PBB member Tovey Moody (Tovey) about the incident.

A few days before the killings, Lonnie testified that various YAH members were hanging out in the parking lot next to the Williams Street Apartments. At some point, Tovey arrived, spoke with Edward and Deshawn and then gave Deshawn "something." Edward, Deshawn and Tovey then got into a truck and left.

A few minutes later, Lonnie testified he heard multiple gunshots. PBB member Wealton Moody (Wealton), who was hanging out with YAH members in the parking lot, yelled "sawoop," which is a Blood call. Wealton received a phone call shortly thereafter and he, Lonnie and one or more YAH members ran the short distance to the Peppertree Apartments where Smith was "held up."

Lonnie testified that when they arrived at the Peppertree Apartments, Tovey and Smith were arguing about the liquor store incident. Demontre testified that he was visiting a friend at the Peppertree Apartments when he heard the confrontation between

Tovey and Smith and that Tovey told Smith, "I heard you came at my little homie foul," or words to that effect. By "little homie," Tovey was referring to Deshawn.[5] According to Demontre, Smith responded, "[W]ell, I didn't want my little brother in that shit." Tovey then told Smith he had no problem with Smith's demand.

However, Smith was angry. According to Demontre, Smith threatened to "bring some of [his] homies to make sure none of this shit pops off," which Demontre took to mean that Smith was going to bring backup to ensure nothing went wrong when Robert got out of YAH. Tovey then remarked to Smith, "I know you're not talking about gun play."[6] At that point, a neighbor got between Smith and Tovey and everyone left.

On February 7, 2006—the day of the killings, Smith told Robert he was taking him to get "jumped out" of YAH.[7] Deshawn told YAH members that they were going to "fight Gateway [e.g., GPC] homies."

---

[5] Darien Howard (Darien) lived at the Peppertree Apartments. Darien testified he heard Tovey tell Smith, "[Y]ou disrespected my blood" and explained that Deshawn and Tovey were cousins.

[6] "Gun play" in gang jargon means guns will be involved in a confrontation.

[7] To join a criminal street gang, potential members often have to be "jumped in," which typically involves three or four members of the gang beating the potential new member for a set period of time while the new member does his or her best to fight back. Likewise, in order to get out of a gang, a member must be "jumped out," which typically involves a beating of that member by the same members that jumped him or her into the gang.

8

Smith picked up Robert after school, then picked up Vincent, Demetrius and Julian McKee (Julian), a member of Eastside Banning Park Crips gang affiliated with GPC. Smith brought Julian and the others to the "jump out" because Smith wanted Robert out of YAH and because he wanted to make sure Robert did not get beaten too badly and things did not get out of hand. Vincent had a gun in his waistband. As they drove, they discussed the jump out and agreed they would shoot back only if shot at first. Robert told Smith that YAH members Edward and Aaron had jumped him into the gang.

Wealton's girlfriend Jasmine Roth (Jasmine) testified she picked up Wealton on the morning of the killings and together they drove to Los Angeles to visit Wealton's family. Although Jasmine testified she could not remember whether Wealton obtained a gun while in Los Angeles, she admitted telling police during an earlier interview that they drove to Los Angeles to pick up a gun and then drove back to Banning. As they drove, Jasmine heard Wealton speak to his brother Tovey on the phone and heard them mention Smith.

Demontre testified he was hanging out at a friend's house at about dusk on the day of the killings when he was joined by YAH members Lonnie and Edward. At some point, Lonnie and Edward told Demontre they were "about to go put out [Robert]" and left the Peppertree Apartments. A few minutes later, out of curiosity Demontre headed over to the Williams Street Apartments. When he found nobody there, Demontre went back to the Peppertree Apartments and waited for his friend to come outside. After

9

waiting about 45 minutes, Demontre left by himself and went back to the Williams Street Apartments where he encountered a large group of men. Demontre went up to Tovey and out of respect shook his hand. Demontre also shook hands with Deshawn, Edward, Lonnie, Aaron and other "homies" of the group. While they were waiting around, Demontre watched Tovey give Deshawn what appeared to be a gun. According to Demontre, Tovey had another gun on him.

Demontre testified Smith and Robert arrived in Smith's car, followed by two other cars. All of the occupants of the cars got out and approached the group of men that had gathered outside the Williams Street Apartments. Smith appeared angry.

Lonnie testified that Smith, Vincent, Demetrius and Robert pulled up in Smith's car and exited the vehicle. Smith then pointed at Edward and Aaron and said, "I want you guys to put my brother off." According to Lonnie, Smith did not seem particularly angry but did appear upset. Robert appeared nervous. The decision was made to do the "jump out" in a field, next to the Williams Street Apartments. The two groups remained separate as they headed to the field. Just before the fight began, Smith said, "I don't want nobody kicking my brother in the head." According to Lonnie, Smith's attempts to give orders to YAH members did not sit well with them.

At some point, Robert heard Deshawn tell Edward and Aaron, "You guys know what you guys got to do." At that point, according to Robert he squared off with Edward and Aaron and took a swing at Aaron. Smith and Demetrius were just a few feet away.

10

Robert testified that Aaron swung back and hit him in the face. As they continued, Robert testified Aaron got the best of him, and was basically preventing Edward from hitting Robert because Aaron wanted to settle things himself. At some point, one of the punches thrown by Aaron bloodied Robert and knocked him to the ground. As he fell, Robert grabbed Aaron's shirt. Smith intervened, grabbed Robert and pulled him up. Robert testified that Smith acted calmly as he pulled Robert to his feet.

What happened next was the subject of much discussion at trial.

Lonnie testified that YAH member Jesus Hernandez (Jesus) yelled at Smith, "Fuck that JR [Smith]. He [Robert] got put on by four people." Lonnie testified this meant that because four people had jumped in Robert, four people had to jump him out. In response, Smith said, "Fuck you" and walked over to Jesus and took a swing at him. According to Lonnie, PBB member Curlee Mitchell (Curlee) grabbed Smith and told him to calm down. Lonnie heard a gunshot from behind, ducked and then took off running. As he ran he heard more gunshots and estimated there were a total of seven or eight shots fired.

Robert testified that as Jesus came near the fight, Smith tried to stop Jesus and then took a swing at him, which Jesus blocked. Robert testified he saw Deshawn, who had been leaning on a brick wall nearby, pull out a gun and start shooting. Robert testified he saw the flash from the muzzle. Robert hopped a fence and began running. Lonnie and Jermarr also started running.

11

Demontre testified YAH members Deshawn, Lonnie, Aaron, Edward and Jermarr came at Robert after Robert approached the group. According to Demontre, all of these individuals struck Robert, who attempted to fight back. With Robert on the ground, Demontre heard Smith say, "Fuck this shit," saw Smith pull out a gun from his pants and point it at several people. Demontre saw Deshawn and Tovey respond by each pulling out a gun. As he dropped to the grass, Demontre heard several gunshots ring out. He then ran from the field back to the Peppertree Apartments. Along the way he saw several other people also running from the crime scene.

Julian told investigators during a police interview that he did not see who fired the shots, but that once the shooting started he saw Smith with a handgun. Julian, however, said that Smith was not the shooter and that the other group did the shooting.

Demetrius died at the scene after being shot four times. Vincent was shot twice; one of the bullets struck his spinal cord and paralyzed him. Vincent later died at the hospital.

C. *Forensic Evidence*

Police investigators recovered two guns, five expended 9 mm bullet casings and two expended .40 caliber casings. The bullets recovered from Demetrius's body were 9 mm, while the single bullet recovered from Vincent's body was a .40 caliber bullet.

D. *Smith Threatens a Witness*

In February 2006, Jochanna Tamez (Jochanna) lived at the Williams Street Apartments with her mother and son. She was called as a witness at the preliminary hearing and at trial.

During the preliminary hearing, Riverside Deputy Sheriff Denice Hamilton was on duty as the courtroom deputy. While Jochanna was on the stand, Deputy Hamilton saw Smith use his forefinger and thumb to form a gun and then pointed it at his jaw line. Smith held his hand in this position for several seconds while he stared at Jochanna on the witness stand. Smith appeared hostile and irritated. When Deputy Hamilton approached Smith, Smith slowly moved his hand to his neck to make it look as though he was scratching his throat. As a result of the threat, Jochanna changed her testimony out of fear.

## DISCUSSION

A. *Aiding and Abetting*

Smith argues his murder convictions must be reversed because, according to Smith, as a matter of law a defendant can only be liable for aiding and abetting a *confederate*—in contrast to a *co-participant* or *co-principal*. That is, because the murder victims in this case were Vincent (Smith's friend) and Demetrius (Smith's cousin), and because the murderers likely[8] were rival gang members, Smith argues he could not be

---

[8] Smith argues that the prosecutor "seemed to acknowledge" that Deshawn, and not

guilty of the target offense of disturbing the peace or assault or battery, or the nontargeted offense of murder based on the natural and probable consequences doctrine.

In support of his argument, Smith heavily relies on our Supreme Court's decision in *People v. Prettyman* (1996) 14 Cal.4th 248, 269, where the court discussed the natural and probable consequences as follows: "Under California law, a person who aids and abets a *confederate* in the commission of a criminal act is liable not only for that crime (the target crime), but also for any other offense (nontarget crime) committed by the *confederate* as a 'natural and probable consequence' of the crime originally aided and abetted. To convict a defendant of a nontarget crime as an accomplice under the 'natural and probable consequences' doctrine, the jury must find that, with knowledge of the perpetrator's unlawful purpose, and with the intent of committing, encouraging, or facilitating the commission of the target crime, the defendant aided, promoted, encouraged, or instigated the commission of the target crime. The jury must also find that the defendant's *confederate* committed an offense other than the target crime, and that the nontarget offense perpetrated by the *confederate* was a 'natural and probable consequence' of the target crime that the defendant assisted or encouraged." (*Id.* at p. 254, italics added.)

---

Smith, was the actual shooter in this case. Nonetheless, Smith argues "there really was no direct evidence whatsoever showing who fired the fatal shots" in this case.

However, since deciding *People v. Prettyman*, our high court has revisited the natural and probable consequences doctrine on a number of occasions, including recently in *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254 and in *People v. Medina* (2009) 46 Cal.4th 913.  In both instances, our Supreme Court analyzed this doctrine using words other than "confederate" to describe the circumstances in which an aider and abettor can be found guilty not only for the target offense, but also for the nontarget offense.

For example, in *People v. Gonzales and Soliz* the court described the doctrine as applying to "any reasonably foreseeable offense committed by the *person* he or she aids and abets."  (*People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 296, italics added; see also *People v. Canizalez* (2011) 197 Cal.App.4th 832, 851 [using the word "person" and "perpetrator" to discuss liability under this doctrine]; *People v. Hoang* (2006) 145 Cal.App.4th 264, 269 ["person"].)

Similarly, in *People v. Medina* our Supreme Court described the doctrine as applying to " 'any other crime the *perpetrator* actually commits [nontarget offense] that is a natural and probable consequence of the intended crime.' "  (*People v. Medina*, *supra*, 46 Cal.4th at p. 920, italics added; *People v. Richardson* (2008) 43 Cal.4th 959, 1021 [describing aider and abettor liability under the natural and probable consequences doctrine as requiring " 'knowledge that the *perpetrator* intends to commit a criminal act together with the intent to encourage or facilitate such act' "]; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1122-1123 [using "actual perpetrator" and "perpetrator" to describe

15

aider and abettor liability under this doctrine]; see also *People v. Miranda* (2011) 192 Cal.App.4th 398, 407-408 [using the words "actual perpetrator," "perpetrator" and "confederate" to describe aider and abettor liability under the doctrine]; *People v. Hart* (2009) 176 Cal.App.4th 662, 670-671 ["actual perpetrator"]; *People v. Vasco* (2005) 131 Cal.App.4th 137, 161 ["perpetrator" and "confederate"].)

What's more, other courts analyzing the doctrine have discussed aider and abettor liability in terms of crimes committed by a "co-participant" (see e.g., *People v. Ayala* (2010) 181 Cal.App.4th 1440, 1450), which also happens to be the language used in then-applicable CALCRIM No. 403, which provided in part as follows:

"To prove that the defendant is guilty of *<insert non-target offense>*, the People must prove that:

"1.  The defendant is guilty of *<insert target offense>*;

"2.  During the commission of *<insert target offense>* a *coparticipant* in that *<insert target offense>* committed the crime of *<insert non-target offense>*;

"AND

"3.  Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the *<insert non-target offense>* was a natural and probable consequence of the commission of the *<insert target offense>*."  (Italics added.)

16

Then-applicable CALCRIM No. 403 defined a "coparticipant" as "[T]he perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander."[9]

Thus, the above authorities clearly show that aider and abettor liability under the natural and probable consequences doctrine is not limited to crimes committed by a confederate, as Smith argues.

In our view, Smith's argument is premised on a fundamental misunderstanding of the natural and probable consequences doctrine: "Aider and abettor culpability under the natural and probable consequences doctrine for a nontarget, or unintended, offense committed in the course of committing a target offense has a different theoretical underpinning than aiding and abetting a target crime. Aider and abettor culpability for the target offense is based upon the intent of the aider and abettor to assist the direct perpetrator commit the target offense. By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense.

---

[9]     CALCRIM No. 403 was revised in 2010. Revised CALCRIM No. 403 continues to premise aider and abettor liability on crimes committed by a "coparticipant" and employs the same definition of coparticipant that was used in former CALCRIM No. 403 that was applicable when Smith was tried and convicted.

(*People v. Garrison* (1989) 47 Cal.3d 746, 778 [accomplice liability is vicarious].) Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime." (*People v. Canizalez*, *supra*, 197 Cal.App.4th at p. 852.)[10]

In any event, we decline to adopt a rule premising aider and abettor liability under the natural and probable consequences on whether the nontarget offense was committed by a "perpetrator," an "actual perpetrator" or a "person," on the one hand, or a "confederate" of defendant, on the other hand, particularly in the light of the facts of the instant case where the killings resulted from a gang confrontation between members of rival gangs.

Indeed, the rule proposed by Smith would require the People to prove the identity of the shooter and match the bullets fired to the shooter, a task which is often difficult, as this case demonstrates.[11] (See *People v. Albillar* (2010) 51 Cal.4th 47, 62 [noting that

_____

[10]    Although liability for aiding and abetting a target crime requires among other elements that a "defendant *knew* that the perpetrator intended to commit the [target] crime" (CALCRIM No. 401, italics added), this element is *not* required when imposing liability under the natural and probable consequences doctrine. Instead, accomplice liability under the doctrine focuses on whether a reasonable person in the defendant's position would have known that the commission of the nontarget offense by a "coparticipant" was a natural and probable consequence of the commission of the target offense by the defendant and coparticipant. (CALCRIM No. 403, *ante*.)

[11]    See footnote 9, *ante*.

part of a gang's "internal code" is to ensure that gang members do not cooperate with police]; *People v. Vazquez* (2009) 178 Cal.App.4th 347, 354 [noting that witnesses, including other gang members, often are " 'fearful to come forward, assist law enforcement, testify in court, or even report crimes that they're victims of for fear that they may be the gang's next victim or at least retaliated on by that gang.' "].)

In addition, the rule proposed by Smith would undermine the doctrine's policy of extending criminal liability to a defendant who knowingly and intentionally encourages, assists or influences a criminal act of another when the latter's crime is the natural and probable consequence of the criminal act so encouraged, assisted or influenced. (See *People v. Brigham* (1989) 216 Cal.App.3d 1039, 1052-1053.)

The instant case provides a vivid example of the injustice that would result if, as Smith argues, we untethered the natural and probable consequences doctrine from its "foreseeability" mooring. (See *People v. Prettyman*, *supra*, 14 Cal.4th at p. 260 [doctrine "is based on the recognition that 'aiders and abettors should be responsible for criminal harms they have naturally, probably and foreseeably put in motion.' "].) In the instant case there is overwhelming evidence supporting the jury's finding that a reasonable person in Smith's position would have known that the murders of Vincent and Demetrius, (allegedly) by rival gang members (nontarget offense), was a natural and probable consequence of the commission of the crimes of disturbing the peace or assault or battery (target offense), inasmuch as rival gang members from the Cribs and Bloods were both in

19

attendance for Robert's "jump out"; Smith brought members of GPC to the jump out as backup in case things got out of hand; there already had been altercations between Smith and members of YAH/PBB regarding Robert's "treatment" by YAH; and PBB was known to carry guns and use them against rival gangs, including GPC. To ignore all these facts and nonetheless conclude on this record that Smith could not be liable for murder as an aider and abettor merely because the killings involved individuals who accompanied Smith to the "jump out" or because the murderer was from a rival gang, would turn the natural and probable consequences doctrine on its proverbial head.[12]

B.  *Jury Instructions*

1.  *Governing Law*

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case."  [Citation.]  That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citations],

---

[12]    In light of our rejection of Smith's argument that aider and abettor liability required the killer of Vincent and Demetrius to be a "confederate" of Smith, it is unnecessary to decide whether his murder convictions must be overturned for lack of evidence that the killings were committed by a confederate of Smith.

but not when there is no evidence that the offense was less than that charged. [Citations.]' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)  If there is substantial evidence supporting such an instruction, it must be given even if it is inconsistent with the defense presented.  (*People v. Barton* (1995) 12 Cal.4th 186, 194–195.)

However, "the trial court need not instruct on a lesser included offense whenever any evidence, no matter how weak, is presented to support an instruction, but only when the evidence is substantial enough to merit consideration by the jury.  [Citation.]" (*People v. Barton*, *supra*, 12 Cal.4th at p. 195, fn. 4.)  We independently review a claim that the trial court erred in failing to instruct on a lesser included offense.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

2.  *Heat of Passion and Perfect/Imperfect Defenses*

Voluntary manslaughter is a lesser included offense of murder.  (*People v. Lewis* (2001) 25 Cal.4th 610, 645; *People v. Barton*, *supra*, 12 Cal.4th at p. 199.)  A homicide is voluntary manslaughter rather than murder if the defendant killed in a "sudden quarrel or heat of passion" (§ 192, subd. (a)) or in an unreasonable but good faith belief in the need to act in self-defense.  (*People v. Blakeley* (2000) 23 Cal.4th 82, 89, 91; accord, *People v. Breverman*, *supra,* 19 Cal.4th at p. 163.)  "Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by *negating the element of malice* that *otherwise inheres* in such a homicide [citation], voluntary manslaughter of these two forms is considered a lesser necessarily included

21

offense of intentional murder [citation]." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 154, fn. omitted.)

a. Heat of Passion

A homicide is deemed to result from heat of passion only if there is a provocation of such character and degree that it would cause a reasonable person of average disposition " ' "to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' [Citations.]" (*People v. Breverman*, *supra*, 19 Cal.4th at p. 163.) Significantly, the " 'provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 583.) " 'The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]' " (*Id.* at pp. 583-584.) " ' "Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' " [Citation.]' [Citations.]" (*Id.* at p. 584.)

"Thus, '[t]he heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill

22

under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. As we explained long ago in interpreting the same language of [Penal Code] section 192, "this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances," because "no defendant may set up his [or her] own standard of conduct and justify or excuse himself [or herself] because in fact his [or her] passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man [or woman]." [Citation.]' [Citations.]" (*People v. Manriquez, supra*, 37 Cal.4th at p. 584.)

Here, Smith argues there was sufficient evidence to require a heat of passion instruction because the jury could have found that Tovey and/or Deshawn pulled out their weapons and fired the fatal shots when they were provoked by Smith "at the culmination of a jump out attended by members of two to four gangs," after Smith pulled out a gun and pointed it at the people who were beating his younger brother Robert after Robert was knocked to the ground. We disagree.

First, Smith in his lengthy brief cites no evidence in the record, much less sufficient evidence " ' "from which a jury composed of reasonable [persons] could . . . conclude[]" ' " (see *People v. Breverman, supra*, 19 Cal.4th at p. 162) that Tovey and/or Deshawn actually, subjectively killed Vincent and/or Demetrius under the heat of passion. (*See People v. Manriquez, supra*, 37 Cal.4th at p. 584.) For this reason

23

alone we reject Smith's argument the trial court erred in failing to give sua sponte the heat of passion instruction.

Second, our high court repeatedly has rejected arguments that "insults or gang-related challenges would induce sufficient provocation in an *ordinary* person to merit an instruction on voluntary manslaughter." (See *People v. Enraca* (2012) 53 Cal.4th 735, 759.)

Third, even assuming Smith could proffer sufficient evidence to satisfy the subjective and objective components of heat of passion, Smith's brief includes no citation to any evidence showing that the victims in this case—Vincent and Demetrius—caused the provocation that incited Tovey and/or Deshawn to use lethal force. (See *People v. Manriquez, supra*, 37 Cal.4th at p. 583.) If anybody caused the provocation, according to Smith it was him, when he claims witnesses saw him pull out a gun and point it *not* at Tovey and/or Deshawn, but rather at the YAH members who were beating Robert. Thus, for this additional reason we conclude the trial court did not have a duty to instruct sua sponte on heat of passion.

b. Perfect Defenses

"Perfect" self-defense is a complete defense to a murder charge and requires evidence that the defendant reasonably believed he or she was in imminent danger of death or great bodily injury. (*People v. Moye* (2009) 47 Cal.4th 537, 550.) As noted *ante*, "imperfect" self-defense negates malice, reduces homicide to voluntary

24

manslaughter and exists when the defendant subjectively, but unreasonably, believed in the need for self-defense. (*Ibid.*)

We reject Smith's argument that the trial court erred when it failed to instruct on perfect defense of another. Smith argues he was entitled to this instruction because witnesses testified he drew a gun (which he denied) after Robert was beaten to the ground during the jump out. Thus, according to Smith he was acting in defense of his brother.

However, Smith's conduct with respect to his brother had no bearing on whether defense of another justified the murders because Deshawn and/or Tovey (allegedly) fired the fatal shots, not Smith. Thus, we look to Deshawn and/or Tovey to determine whether this defense was applicable.

As before, Smith has cited to no evidence in the record, much less substantial evidence (see *People v. Moye, supra,* 47 Cal.4th at p. 553 [" 'the existence of "*any* evidence, no matter how weak," will not justify instructions on a lesser included offense' "]), showing Deshawn and/or Tovey reasonably believed that Robert, Aaron, Edward and/or any other individuals involved in the fight at the jump out were in imminent danger of suffering bodily injury; that Deshawn and/or Tovey reasonably believed that the immediate use of force was necessary to defend against that danger; and that Deshawn and/or Tovey used no more force than reasonably necessary to defend against that danger. (See e.g., *People v. Villanueva* (2008) 169 Cal.App.4th 41, 49-50.)

25

In addition, Deshawn was not entitled to a defense of another instruction inasmuch as he was one of the individuals, along with Smith, who initiated and/or participated in the jump out. (See *People v. Enraca*, *supra*, 53 Cal.4th at p. 761 [self-defense "may not be invoked by a defendant who, through his [or her] own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his [or her] adversary's attack or pursuit is legally justified."].)

Indeed, Robert testified he heard Deshawn tell Edward and Aaron, "You guys know what you guys got to do." In addition, on the day of the killings Deshawn told YAH members that they were going to "fight Gateway [e.g., GPC] homies." The record also shows Smith wanted the jump out for Robert because Smith did not want Robert "in that shit," or words to that effect. Thus, for this separate and independent reason we conclude the defense of another instruction was not warranted under the facts of this case.

We also conclude Smith was not entitled to a perfect self-defense instruction because Smith has failed to cite to any evidence in the record that Deshawn and/or Tovey entertained a reasonable belief that they were in, or one of them was in, imminent danger of death or great bodily injury when one or both of them (allegedly) shot Vincent and/or Demetrius. Rather, the evidence in the record strongly suggests that when Smith stepped in to stop the beating of Robert during the jump out, Deshawn promptly pulled out a gun and started shooting.

26

The record shows that Smith requested and the trial court gave an imperfect defense instruction. Smith claims the instruction was erroneous and his murder conviction must be reversed. We turn to this issue next.

c. Imperfect Defenses

The trial court instructed the jury on imperfect defense of another/self-defense, CALCRIM No. 571, as follows:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because (he/she) acted in (imperfect self-defense/ or imperfect defense of another).

"The defendant acted in (imperfect self-defense or imperfect defense of another) if:

"1. The defendant actually believed that (he or someone else) was in imminent danger of being killed or suffering great bodily injury;

"AND

"2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger;

"[But]

"3. His belief was unreasonable.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.

27

"In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

"If you find that the decedents threatened or harmed the defendant or others in the past, you may consider that information in evaluating the defendant's beliefs.

"If you find that the defendant knew that the [decedents] had threatened or harmed others in the past, you may consider that information in evaluating the defendant's beliefs.

"If you find that the defendant received a threat from someone else that (he) reasonably associates with the decedents, you may consider that threat in evaluating the defendant's beliefs.

"Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in (imperfect self-defense/ or imperfect defense of another). If the People have not met this burden, you must find the defendant not guilty of murder."

Smith argues the use of the word "defendant" in CALCRIM No. 571 misled the jury because the instruction as written would not apply to Smith unless he, as opposed to Deshawn and/or Tovey, killed another person. The People agree the instruction should have used the word "perpetrator" in lieu of the word "defendant," but contend that error was harmless. We agree with the People.

28

First, although the trial court chose to instruct on imperfect defense of another/self-defense, our independent review of the record suggests there was insufficient evidence to support such an instruction. Indeed, there is a lack of evidence in the record, and none cited by Smith, suggesting that Deshawn and/or Tovey *actually* entertained even an unreasonable belief that they were, or one of them was, in imminent danger of death or great bodily injury when they or one of them (allegedly) shot Vincent and/or Demetrius. (See CALCRIM No. 571.) For this reason alone, we conclude any error in using the word "defendant" as compared to "perpetrator" in CALCRIM No. 571 was harmless. (See *People v. Watson* (1956) 46 Cal.2d 818, 826; *People v. Breverman*, *supra*, 19 Cal.4th at p. 178 ["[I]n a noncapital case, error in failing sua sponte . . . to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v.*] *Watson*" and thus such error may be reversed "only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred [citation]." (Fn. omitted.)].)

Second, in reviewing CALCRIM No. 571 in the light of the other instructions given the jury and of the closing arguments of counsel, we conclude CALCRIM No. 571 was not confusing to the jury. (See *People v. Moore* (2011) 51 Cal.4th 1104, 1140 [in evaluating a claim whether an instruction is misleading, we consider the instructions as a

whole, not just in isolated parts]; *People v. Smithey* (1999) 20 Cal.4th 936, 963 [same]; *People v. Kelly* (1992) 1 Cal.4th 495, 524-527 [reviewing court examines the jury instructions as a whole, along with the attorney's closing argument to the jury, to determine if the instructions sufficiently conveyed the correct legal principles].)

Here, the record shows the trial court also gave CALCRIM No. 403, as discussed *ante*, in which the trial court used the words "coparticipant" to describe the crime of murder or the lesser offense of voluntary manslaughter for which Smith also was charged.

Moreover, during closing argument the prosecution argued that Smith was guilty in counts 1 and 2 under an aiding and abetting theory based on the natural and probable consequences doctrine:

"Guilty of murder?  Is [Smith] guilty of murder?  You have before you the legal theory of this under aiding and abetting and natural and probable consequence.  The best example I can give to you for this particular theory of liability is that if a bunch of gang members go to a location armed with weapons for a fight and somebody dies, the person can be guilty of murder even if he did not intend to kill somebody.  What does that sound like?  This case."

The prosecution also argued the murder was a reasonably foreseeable consequence of the gang fight:

"If [Smith] didn't hold the gun and shoot the bullets that were fired that ended the lives of our two victims, we have to think about was going on in the mind of the shooter at the time, right?"  The prosecution also noted that there was sufficient evidence of first degree murder, noting:

"What else is premeditated murder?  In terms of the other individual, the individual who actually fired the gun.  We're talking about [Deshawn].  What was going on in [Deshawn's] head at the time?"  The prosecution noted that Deshawn's conduct provided sufficient evidence of premeditation and deliberation to support first degree murder convictions of Smith, even if Deshawn fired the fatal bullets, based on the natural and probable consequences doctrine.

Similarly, during closing Smith's defense counsel argued that Deshawn was the shooter and implored the jury when considering the nontarget offense of murder to consider the issue through Deshawn's eyes.  Defense counsel also argued that to get to voluntary murder, the jury needed to determine whether "*Deshawn* . . . act[ed] upon a sudden quarrel or heat of passion or an unreasonable self-defense."  (Italics added.)  Defense counsel reiterated that "if *Deshawn* . . . allegedly reacts to my client pulling a gun, which means he is in fear for somebody's life, he has a right to use self-defense or defense of others.  If it's unreasonable—if it's reasonable, it's not a crime, it's a defense.  If it's unreasonable, it's voluntary manslaughter."  (Italics added.)

31

Finally, defense counsel argued at length that Deshawn's actions were not foreseeable, and thus Smith's commission of the target offense was not sufficient to find him guilty of the nontarget murder offenses.

Thus, when considering the instructions as a whole and the lengthy argument of counsel on the issue of Smith's liability as an aider and abettor under the natural and probable consequences doctrine, we conclude it was not reasonably likely the jury misapplied CALCRIM No. 571, as given in this case.[13]

C. *Jury Question during Deliberations*

1. *Additional Background*

During deliberations, the jury sent the following question to the court: "Please explain manslaughter and how it would apply to this case or is it part of every case? [¶] Do we need to agree with all three parts/portions of voluntary manslaughter criteria to find Smith guilty?" The court stated for the record that it had discussed the jury question in chambers with counsel and that it tentatively intended to respond as follows: "[the jury] can consider voluntary manslaughter in this case as a lesser offense if the jury

_____

[13]   For the same reasons, we also reject Smith's argument that use of the word "defendant" in CALCRIM No. 571 precluded the jury from considering the threats against Robert by members of YAH.  In any event, these threats were not relevant to the states of mind of Deshawn and/or Tovey, which as the shooters were the *only* mental states relevant to the determination of whether imperfect defense of others/self-defense reduced the murders to manslaughter.

unanimously finds the defendant not guilty of murder. [¶] The three elements under CALCRIM [No.] 571 defining manslaughter must be proved beyond a reasonable doubt."

The prosecution agreed with the court's tentative response but requested the court also tell the jury that it "can base their decision on any one of the facts presented to apply to each of the [three] elements" of voluntary manslaughter. Smith's trial counsel stated he agreed in part with the court's tentative response, disagreed with the prosecution's additional request and suggested, albeit confusingly, the court provide "a little bit of explanation" as follows: "What I would like to add to what the Court has indicated is simply a little bit of explanation of—to—also to some extent address the second question of whether it's a part of every case is to tell them, you know, how murder and manslaughter, why they get—maybe why they get that as a lesser-included offense, and in fact, however, the theory of liability in terms of making a non shooter the non killer liable is the same [for manslaughter as] it would be for murder. Something to that effect. So they understand what the relationship is. [¶] Submit."[14]

The court confirmed in writing its tentative response and noted on the record that if the jury had further questions on this issue, it would consider going into more detail at that time.

---

[14] We will consider Smith's argument on the merits, despite his counsel's somewhat inarticulate objection to the trial court's tentative response to the jury question and despite his counsel's agreement in part with that response. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 [agreement by defense counsel to trial court's response to jury question forfeits contention on appeal that response was inadequate].)

2. *Governing Law and Analysis*

Section 1138[15] imposes on the trial court a mandatory "duty to clear up any instructional confusion expressed by the jury.  [Citations.]"  (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212, superseded on another point as stated in *In re Steele* (2004) 32 Cal.4th 682, 690.)  "This does not mean the court must always elaborate on the standard instructions.  Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.  [Citation.]"  (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

We agree with Smith that the trial court erred as a matter of law when it responded that the jury was required to find unanimously Smith was not guilty of murder before it could even *consider* voluntary manslaughter.  Addressing this issue, our Supreme Court held:  "[A] court may restrict a jury from returning a verdict on a lesser included offense before acquitting on a greater offense, but may not preclude it from *considering* lesser offenses during deliberations."  (*People v. Dennis* (1998) 17 Cal.4th 468, 536 (italics added), citing *People v. Kurtzman* (1988) 46 Cal.3d 322, 324-325 [a court may "restrict []

_____

15    Section 1138 provides:  "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court.  Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

34

a jury from *returning a verdict* on a lesser included offense before acquitting on a greater offense," but may not "preclude [it] from *considering* lesser offenses during its deliberations."].)

"Thus, a trial court should not tell the jury it must first unanimously acquit the defendant of the greater offense before deliberating on or even considering a lesser offense." (*People v. Dennis*, *supra*, 17 Cal.4th at p. 536; see also *People v. Berryman* (1993) 6 Cal.4th 1048, 1073 [noting the implicit rejection of a " 'strict acquittal-first rule under which the jury must acquit of the greater offense before even considering lesser included offenses.' "], overruled on another ground as stated in *People v Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

Although the trial court here erred in how it responded to the jury's question, we conclude on this record that error was harmless. Indeed, as noted above our independent review of the record shows there is a lack of evidence in the record, and none cited by Smith, suggesting that Tovey and/or Deshawn *actually* entertained even an unreasonable belief that they or others were in imminent danger of death or great bodily injury when one or both of them (allegedly) shot Vincent and/or Demetrius. (See CALCRIM No. 571.)

As such, we conclude it was not reasonably probable Smith would have enjoyed a better outcome had the trial court properly instructed the jury that it could consider the lesser included offense of voluntary manslaughter based on imperfect defense of

35

others/self-defense. (See *People v. Watson*, *supra*, 46 Cal.2d at p. 826; see also *People v. Eid* (2010) 187 Cal.App.4th 859, 882 [cited by Smith, in which the court recognized that a "court's failure under section 1138 to adequately answer the jury's question 'is subject to the prejudice standard of *People v. Watson* . . .,' i.e., whether the error resulted in a reasonable probability of a less favorable outcome."].)

D. *Death Certificate of Demontre*

Smith next argues the jury's accidental receipt of Demontre's death certificate constitutes jury misconduct requiring reversal of Smith's conviction.

1. *Additional Background*

In November 2006, Demontre testified at the preliminary hearing. Demontre was later killed, and thus the trial court ruled he was unavailable as a witness and allowed his preliminary hearing testimony to be read to the jury. In late February 2009 after the jury reached its verdicts, Smith's trial counsel filed a new trial motion on the basis the jury at the start of deliberations received Demontre's death certificate with the exhibits from trial. The death certificate provided Demontre died of "multiple gunshot wounds."

The trial court denied Smith's new trial motion. Invoking the *People v. Watson* standard to evaluate prejudice, as argued by Smith, the trial court found it was not reasonably probable that a result more favorable to Smith would have resulted had the death certificate not been inadvertently given to the jury. In denying the new trial motion, the court made a "clear record" on this issue as follows:

"As far as the death certificate is concerned, the People proffered that to establish the death of Mr. Demontre Carroll, which was necessary for the Court to make a finding of unavailability so the prior testimony could be properly read to the jury. And that was the reason why the death certificate was marked as an exhibit and considered by the Court. But for that, the death certificate was of no relevance to the balance of the case. I would have excluded it as irrelevant and potentially prejudicial. [¶] The situation was there were numerous exhibits, 450 exhibits, or maybe more. When [the prosecutor] made her motion—I don't want to speak for her—but I don't think specifically she was thinking about the death certificate. Because I know that, [Smith's defense counsel], you weren't either.

"[Defense counsel]: Correct.

"THE COURT: The other attorneys weren't either, because this went to both juries.[16] [¶] And it happened. It shouldn't have happened. But I think more care should have been exercised by everyone involved, including the Court. But it happened. [¶] And let the record be very clear that if it came to my attention that that was going to the jury, I would have excluded it. [¶] The question now before the Court is whether or not in the Court's evaluation of the evidence whether there was reasonable probability

16      Smith was tried together with two other defendants. The court therefore empanelled two juries, one for Smith and one for the other two defendants. Smith's jury was designated the "green jury," while the jury for the two defendants was called the "yellow jury."

that a result more favorable to [Smith] would have been reached in the absence of the error. This is a high burden.

"In evaluating all the evidence . . . I can't say that a more probable result—reasonably probable result would result in this case. I can't say that. The appellate court will have the benefit of this record, and they may certainly reach a different opinion. But at this point, I can't say that."

2. *Governing Law and Analysis*

" 'When, as in this case, a jury innocently considers evidence it was inadvertently given, there is no misconduct.' [Citations.] Rather, all that appears is ordinary error." (*People v. Clair* (1992) 2 Cal.4th 629, 668.) As such, "prejudice must be shown and reversal is not required unless there is a reasonable probability that an outcome more favorable to the defendant would have resulted. [Citation.]" (*Ibid.*) "[A] trial court's ruling on a motion for new trial is subject to review for abuse of discretion." (*Id.* at p. 667.)

Smith argues he was unduly prejudiced by the jury's receipt of Demontre's death certificate because according to Smith, the jury heard evidence he threatened another witness (e.g., Jochanna, discussed *ante*) during the preliminary hearing and thus the jury likely would deduce that Smith had some connection to Demontre's death.

Assuming arguendo the jury reviewed the death certificate that it was inadvertently given, we nonetheless conclude the trial court properly exercised its

38

discretion in denying Smith's new trial motion when it found it was not reasonably probable that Smith would have received a more favorable result absent the jury's receipt and review of Demontre's death certificate.

Indeed, there was no testimony regarding the nature of Demontre's death; the court simply told the jury he was unavailable as a witness. Thus, other than the death certificate, which was provided to the jury along with about 450 other exhibits, there was no evidence how Demontre died, and there certainly was no evidence suggesting Smith had anything to do with that death.

We decline Smith's invitation to find the trial court abused its discretion and erred in denying the new trial motion based solely on Smith's speculation of what the jury might have believed in the matter he asserts. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 670 [concluding any error by the trial court in failing to "sanitize" defendant's prison records was harmless "under any standard" because defendant "merely speculates" what the jury might have understood various notations to mean in those records and concluding that "even if the jury had deciphered the meaning of the notations [in the prison records], there is no reasonable probability that the verdict could have been affected by such collateral issues."].)

Moreover, the record contains overwhelming evidence of Smith's guilt in counts 1 and 2 under the natural and probable consequences doctrine and thus for this separate reason we conclude the trial court properly exercised its discretion in denying Smith's

39

new trial motion. (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836; see also *People v. Houston* (2005) 130 Cal.App.4th 279, 301 [admission of hearsay was harmless when other evidence of defendant's guilt was "overwhelming"].)

E. *Invocation of Fifth Amendment Privilege by Potential Defense Witness*

Smith next argues the prosecutor violated his right to present a defense by pressuring defense witness Curlee to invoke his Fifth Amendment privilege against self-incrimination.

1. *Additional Background*

Curlee was arrested in Texas in 2006 for his involvement in the instant case. During a search incident to arrest, officers found three semi-automatic handguns in a drawer in Curlee's room and a substantial amount of drugs and $110,000 in cash in the house where Curlee was living with his brother. This evidence was presented to the jury to demonstrate Curlee's status in PBB. At the time of Smith's trial, Curlee had been arrested but *not* charged in connection with the Texas drug offenses.

During Smith's trial, his counsel indicated the defense intended to call Curlee as a witness. The prosecutor responded:

"I think [Curlee] has made it very clear that he will not speak to anybody without the presence of his lawyer. I have discussed that with [Smith's defense counsel], but it's the People's position that [Curlee] needs to have his lawyer here regardless of whatever research we do."

The record shows the trial court agreed with the People, and noted, "It's an important issue with respect to Mr. [Curlee] Mitchell. He has to understand that he is still subject to prosecution, either State or Federally or both. It's important that he understands that."

Before allowing Curlee to testify, the trial court conducted a hearing regarding Curlee's Fifth Amendment privilege. The court explained that it believed Curlee did have a Fifth Amendment privilege not to testify given the possibility Curlee could be prosecuted in Texas or by the federal government in connection with the drugs and money found at his brother's house when Curlee was initially arrested.

Curlee's defense attorney Richard Swanson (Swanson) told the court he had advised Curlee about the potential liabilities and agreed that his client "does have potential liabilities in regards as to what happened in Texas" under both state and federal law, but that Curlee wanted to testify anyway because Curlee did not believe anything he said would incriminate him with respect to the Texas case. The trial court explained to Curlee that should he testify in the instant case, the prosecutor would be permitted to cross-examine him regarding his involvement with, and knowledge of, the drugs, money and weapons found at his brother's house, and his involvement in PBB.

The trial court then specifically warned Curlee about the possible consequences of testifying:

"THE COURT: And, Mr. Mitchell, I want to make sure that you understand exactly what's going on. [¶] If you do testify, the district attorney would be allowed to ask you questions about possible involvement in Texas with reference to the two kilos of cocaine found, the $110,000 found, and the weapons found, whether you were aware of it, whether you possessed it, your knowledge of the 52 Pueblo Bishop Bloods, and any gang involvement that you might or might not have. [¶] Do you understand?

"Mr. Curlee Mitchell: Yes sir.

"THE COURT: In light of that, you've talked to Mr. Swanson. Mr. Swanson was your trial counsel in here for several months.[17] And I just want to make sure that you understand the situation and that whatever you say today could be evaluated by law enforcement in Texas on a state level, as well as a federal level, to determine ultimately whether or not charges should be filed against you in Texas with reference to those items. [¶] Do you understand?

"Mr. Curlee Mitchell: Yes, Your Honor."

At the conclusion of the People's evidence, Smith's trial counsel called Curlee as a witness. After a short recess, Smith's trial counsel indicated that Curlee had changed his mind about testifying as a general witness in part because the prosecutor "intimidated" him when the prosecutor told Curlee's counsel that she would be "pulling these transcripts

---

17    The record shows Curlee already had been acquitted of all criminal charges in the instant case.

42

and forwarding them to Texas so they could consider them," which Smith's trial counsel concluded effectively prevented Curlee from testifying in the instant case.

In response, the prosecutor noted that Swanson turned over discovery to the prosecutor showing that Curlee's brother's case in Texas was pending on appeal, based on his brother's motion to withdraw his plea. The prosecutor further clarified that she never spoke directly with Curlee, but only with his attorney, that she did intend to pull the transcripts from this case and send them to officials in Texas because she had a "duty and obligation to turn over discovery," and that she decided not to call Curlee as a witness in the People's case-in-chief, despite listing him as a witness, because he refused to talk to the People and thus she did not know what he would testify to if he took the stand.

After the verdicts were returned, Smith filed a motion for new trial based on prosecutorial misconduct. In support of the motion Smith submitted declarations from Curlee and Swanson.

In his declaration, Curlee indicated that Swanson told him about the prosecutor's intention to forward transcripts to the Texas officials if Curlee testified in the instant case. Curlee also said he was told the prosecutor would contact Texas authorities and recommend Curlee be prosecuted for the drug offenses. As a result of the prosecutor's comments, Curlee claimed his counsel advised him not to testify, and thus he invoked his Fifth Amendment privilege and did not appear as a defense witness.

43

Swanson declared it was *his* belief that the prosecutor "was going to assist the other jurisdiction to have Curlee Mitchell prosecuted" if Curlee testified for the defense, that such tactics "appeared to be vindictive" and that for this reason, he advised Curlee not to testify for the defense in the instant case.

During a hearing on that motion, the prosecutor questioned Swanson. Swanson testified that all conversations with the prosecutor regarding whether or not Curlee would testify took place in the presence of the trial judge. Swanson also testified that the prosecutor did *not* say she would request criminal charges be brought against Curlee in Texas if he testified in the instant case. Swanson admitted that to the extent he advised Curlee of that possibility, it was based on Swanson's *own* belief and not on anything said by the prosecutor.

Swanson also testified that his advice to Curlee not to testify was based in part on the trial court's warning to Curlee that he still could be facing criminal liability in Texas and that his testimony in the instant case could potentially affect that liability. Swanson further testified that Curlee was concerned his testimony in the instant case could also adversely affect his brother's case, which at the time was pending on appeal in Texas. Swanson believed the prosecutor's tactics were vindictive because if the prosecutor intended to provide the transcripts of Curlee's testimony in the instant case to Texas officials, she could have done so without making a "public statement" of her intent.

44

Smith argued that the prosecutor was being vindictive because Curlee would not speak to the People but agreed to testify as a defense witness. Moreover, if allowed to testify, Smith argued Curlee would have provided "[v]ery brief statements" that Smith did not have a gun on the night of the murders, that Demontre was not at the scene of the murders and that "he" tried to break up the fight.[18]

The prosecutor responded that the Texas case came about only because of the instant case, when law enforcement went to Texas to locate Curlee, and that the same team of investigators was responsible for both cases. Thus, the prosecutor argued that she was required to provide the Texas officials with a certified transcript of Curlee's testimony from the instant case. In addition, the prosecutor noted that Smith's trial counsel was the one who first brought up the issue of the transcripts, inasmuch as he discussed having them sealed. The prosecutor argued that she discussed sending a certified copy of the transcripts during an in-chambers conference with counsel and the trial judge.

The trial court noted that in reading Curlee's declaration, it was concerned by the statement that Swanson advised Curlee that if he testified for the defense in the instant case, the prosecutor would recommend to the Texas officials that they move forward with the case against Curlee. The trial court noted, however, that Swanson denied the

---

[18]     It is not clear from the record whether "he" referred to Smith, Demontre or some other individual.

prosecutor made such statements, and further noted that the prosecutor did not make any such statements during the chambers conference between counsel and the court. The court recalled the prosecutor saying during that conference she would be providing a certified copy of the transcript if Curlee testified, but noted that the prosecutor had such discretion to do so, if not an outright obligation to provide that information to officials in Texas.

The trial court also noted that at the time it was "very concerned" about Curlee being "fully advised as to the consequences of his testimony" in the instant case, given that during cross-examination the prosecutor would have "some latitude" in questioning Curlee about his knowledge of, and involvement with, the large amount of drugs, cash and weapons found by law enforcement in Texas. In addition, the court recalled there was information that when the house where Curlee was living was under surveillance, Curlee "came outside with his brother, they both got in a car, and that car had an additional large amount of contraband in the back seat on the floorboard."

The trial court also recalled that if Curlee had testified as a defense witness on Smith's behalf, Curlee's exposure was substantial: "This wasn't a situation where it was a petty crime, but a major felony possession for sales of cocaine. [¶] So the Court was very concerned that Mr. Mitchell understand, being a lay person, that if he came in, his testimony was not just going to relate to what happened on February the 7th, '06 [e.g., the night of the killings]; it was going to extend substantially beyond that, and he would be

46

asked concerning his involvement, his knowledge, his nexus with drugs found within easy access to him in the house in Texas."

The court then concluded there was no prosecutorial misconduct when the prosecutor advised counsel during the chambers conference that she would be sharing Curlee's testimony with officials in Texas, and noted that providing such information was "no surprise" to the court, nor to any of the attorneys: "And that's why I took the time and effort to advise Mr. Curlee Mitchell that what he was saying in this court was not going to stay in this court. It certainly could be evaluated in Texas in evaluating whether or not they had additional information which could possibly warrant him being prosecuted in the state of Texas." The court thus denied Smith's new trial motion.

2. *Governing Law and Analysis*

" 'A defendant's constitutional rights to compel the attendance of witnesses, as guaranteed by the Sixth Amendment, and to due process, as guaranteed by the Fourteenth Amendment, are violated when the prosecution interferes with the defendant's right to present witnesses.' [Citations.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 456.) "To prevail on a claim of prosecutorial violation of the right to compulsory process, a defendant must establish three elements. ' "First, he [or she] must demonstrate prosecutorial misconduct, i.e., conduct that was 'entirely unnecessary to the proper performance of the prosecutor's duties and was of such a nature as to transform a defense witness willing to testify into one unwilling to testify.' " [Citation.] Second, he [or she]

47

must establish the prosecutor's misconduct was a substantial cause in depriving the defendant of the witness's testimony. [Citation.] The defendant, however, "is not required to prove that the conduct under challenge was the 'direct or exclusive' cause. [Citations.] Rather, he [or she] need only show that the conduct was a substantial cause. [Citations.] The misconduct in question may be deemed a substantial cause when, for example, it carries significant coercive force and is soon followed by the witness's refusal to testify." [Citation.] Finally, the defendant must show the testimony he [or she] was unable to present was material to his defense.' [Citations.]" (*People v. Jacinto* (2010) 49 Cal.4th 263, 269–270.)

Here, we conclude Smith failed to establish at least two of the three required elements.

Initially, we note Smith does not argue that the trial court erred when it found that the prosecution had some latitude to cross-examine Curlee in the instant case, should he testify as a defense witness, regarding his involvement with, and knowledge of, the drugs, cash and weapons found in the Texas house where he was living.

We also note that Smith does not argue that the prosecutor committed misconduct when she indicated during the chambers conference that she was duty bound to provide officials in Texas with a certified copy of Curlee's testimony in this case should he testify on behalf of the defense. Indeed, the trial court found there was no misconduct because the prosecutor had the discretion, if not the obligation, to provide such information to

48

officials in Texas under the circumstances of this case. Smith cites no authority suggesting otherwise, and thus for this reason alone we conclude the trial court did not err when it denied Smith's new trial motion for alleged prosecutorial misconduct.

However, even if we assume there was misconduct, we nonetheless would conclude it was not a substantial cause in depriving Smith of Curlee's testimony. (See *People v. Jacinto*, *supra*, 49 Cal.4th at pp. 269–270.) The record shows the trial court was "very concerned" that Curlee was properly advised about the possible consequences of testifying in the instant case given the court's determination that during cross-examination the prosecutor would be able to question Curlee about the two kilos of cocaine, money and weapons that were found in the house where Curlee lived with his brother.

Moreover, the record shows Curlee's own counsel was concerned about Curlee testifying in the instant case and the possibility that testimony could be used to charge Curlee in connection with the ongoing case in Texas. The record also shows that Curlee was concerned about negatively impacting his brother's case in Texas after his brother received a 40-year sentence and appealed that sentence. Thus, we conclude Smith also failed to establish the prosecutor's alleged misconduct was a substantial cause in depriving Smith of Curlee's proposed testimony.[19]

———————————

[19] Smith likely could not establish the third element for prosecutorial misconduct, to wit: that Curlee's testimony was material to Smith's defense. (See *People v. Jacinto*, *supra*, 49 Cal.4th at pp. 269–270.) The record shows Curlee refused completely to talk to

49

F. *Active Gang Participation and Section 654*[20]

Section 654, subdivision (a) provides in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

As previously mentioned, our high court in *People v. Mesa* held that section 654 does not permit separate punishment for the section 186.22, subdivision (a) crime of active participation in a criminal street gang when the only evidence of such participation was the current charged offenses, even if there were multiple objectives. (*People v. Mesa*, *supra*, 54 Cal.4th at pp. 199–200.)

In this case, Smith was charged in count 3 with violating section 186.22, subdivision (a). The only evidence of his active gang participation, however, was the evidence associated with the other charged offenses for which he was convicted in counts

and otherwise cooperate with the People and gave the defense only a "very summary statement" about what he would say if he testified. However, according to Swanson, Curlee did not want to give a prior statement to anybody, including the defense. Given the lack of specificity regarding the substance of that proposed testimony, Smith would have a difficult time showing Curlee's testimony was material to Smith's defense. In any event, whether or not Smith had a gun or attempted to break up a fight had little bearing on Smith's main defense—that murder was not a foreseeable consequence of a gang fight.

[20]     As we noted *ante*, the California Supreme Court on September 12, 2012 granted Smith's petition for review and transferred the matter to us with directions to reconsider our initial opinion issued on June 8, 2012 in light of *People v. Mesa*, *supra*, 54 Cal.4th 191, a case that involves this particular issue.

50

1 and 2.  Pursuant to *People v. Mesa*, we now conclude Smith's sentence on count 3 should be stayed in accordance with section 654, subdivision (a).

G.  *Imposition of Criminal Conviction Assessment Fee*

Government Code section 70373 mandates a $30 conviction assessment "shall be imposed on every conviction for a criminal offense[.]"  (Gov. Code, § 70373, subd. (a)(1).)  The trial court imposed a criminal conviction assessment of $90, consisting of a $30 assessment for each of Smith's three offenses.

Smith argues the imposition of the Government Code section 70373 criminal conviction assessment violated the prohibition against ex post facto laws because the January 1, 2009, effective date of the statute was after his offenses were committed.  He is mistaken.

Courts have repeatedly held that the criminal conviction assessment is not punitive and therefore may be imposed retroactively without violating the state and federal prohibitions against legislation.  (See e.g., *People v. Lopez* (2010) 188 Cal.App.4th 474, 479 [concluding the "date of conviction, not the date of the crime, controls application" of Government Code section 70373]; *People v. Phillips* (2010) 186 Cal.App.4th 475, 477-478 [concluding the date of defendant's conviction for possession of drugs, and not the date of the crime, governs imposition of the assessment under Government Code section 70373, subdivision (a)(1)]; *People v. Fleury* (2010) 182 Cal.App.4th 1486, 1494 [concluding imposition of the assessment mandated by Government Code section 70373

51

for crimes committed before the statute's enactment does not violate state or federal prohibitions against ex post facto statutes]; *People v. Brooks* (2009) 175 Cal.App.4th Supp. 1, 7 [concluding the assessment in Government Code section 70373, subdivision (a)(1) is "nonpunitive" and "therefore not a prohibited ex post facto law."].)

We thus conclude the trial court here properly imposed the $90 assessment fee pursuant to Government Code section 70373, subdivision (a)(1).

H. *Correction of Abstract of Judgment*

Finally, Smith argues the abstract of judgment must be corrected because at the time of sentencing the trial court ordered Smith to pay a $200 restitution fine on counts 1 and 2 pursuant to section 1202.4, subdivision (b) and imposed and stayed a parole revocation restitution fine in the same amount, as required pursuant to section 1202.45. However, the abstract of judgment shows that the trial court imposed a $600 fine pursuant to section 1202.4, subdivision (b).

The People contend that the trial court actually imposed separate $200 fines at sentencing, one for each murder count. In addition, although the trial court did not orally pronounce a restitution fine on count 3 for active participation in a criminal street gang, according to the People section 1202.4, subdivision (b) mandates imposition of such a fine. (See § 1202.4, subd. (b) ["In every case where a person is convicted of a crime, the court *shall* impose a separate and additional restitution fine, unless it finds compelling

52

and extraordinary reasons for not doing so, and states those on the record."  (Italics added.)].)

Thus, the People contend the trial court properly imposed a $600 fine, inasmuch as no reasons were stated on the record for not doing so, and because the minimum restitution fine of $200 is set by statute.  (See former § 1202.4, subd. (b)(1) ["The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense, but shall not be less than two hundred dollars ($200), and not more than ten thousand dollars ($10,000) . . . ."])

We note that in his reply, Smith does not dispute the People's contention, which we conclude concedes the issue.  In any event, we agree with the People's reading of section 1202.4, subdivisions (b) and (b)(1), and thus conclude the abstract of judgment correctly states the amount Smith owes in restitution.

However, as to the court security fee imposed by the trial court pursuant to former section 1465.8, the People concede the trial court imposed the amount of the fee per conviction recommended in the probation officer's report, which was $20.  The abstract of judgment lists $90 as the total court security fee, or $30 per conviction.  Because the court's oral pronouncement was to impose a $20 fee per conviction as provided in the probation report (see *People v. Mesa* (1975) 14 Cal.3d 466, 471 [when a discrepancy exists between the oral pronouncement rendering judgment and the minute order or abstract of judgment, the former controls]), we conclude the abstract of judgment must be

53

amended to show court security fees in the total amount of $60 as provided in former section 1465.8, subdivision (a)(1).[21]

Finally, Smith argues, and the People concede, that the trial court improperly imposed a 10-year consecutive sentence on the gang enhancements. (See *People v. Lopez* (2005) 34 Cal.4th 1002, 1007-1011 [imposition of both the 15-year minimum parole eligibility period under section 186. 22, subdivision (b)(5) and the 10-year enhancement under section 186.22, subdivision (b)(1)(C) is unauthorized].) We agree with Smith.

## DISPOSITION

The matter is remanded to the trial court with directions: (1) to stay pursuant to section 654 the imposition of sentence on count 3 for Smith's conviction of active participation in a criminal street gang in violation of section 186.22, subdivision (a); (2) to amend the abstract of judgment (i) to reflect the section 654 stay of execution of sentence on count 3, (ii) to show court security fees in the total amount of $60 as provided in former section 1465.8, subdivision (a)(1) and (iii) to delete the 10-year gang enhancement imposed under section 186.22, subdivision (b)(1)(C); and (3) to forward a

---

[21]     Smith also argues the abstract of judgment erroneously indicates the trial court imposed a 15-year *determinate* term. The People contend no such error exists in the abstract of judgment, as it shows Smith was sentenced to an *indeterminate* term of 15 years to life, which mirrors the oral pronouncement of judgment. Our independent review of the abstract of judgment confirms the People's position, one that Smith did not, in any event, oppose in his reply to respondent's brief.

copy of the modified abstract of judgment to the California Department of Corrections

and Rehabilitation.  In all other respects, the judgment of conviction is affirmed.


                                                                    BENKE, Acting P. J.

WE CONCUR:


          NARES, J.


          HALLER, J.